IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 11, 2007 Session

MANHATTAN, INC., D/B/A NEW YORK NEW YORK
v.
SHELBY COUNTY, TENNESSEE, CITY OF MEMPHIS,
AND MEMPHIS – SHELBY COUNTY OFFICE OF CONSTRUCTION
CODE ENFORCEMENT

An Appeal from the Circuit Court for Shelby County
No. CT-001349-06     Donna M. Fields, Judge

No. W2006-02017-COA-R3-CV - Filed March 11, 2008

This is a petition for a writ of mandamus. The plaintiff purchased a vacant nightclub and sought to reopen it as a topless club. To this end, the plaintiff nightclub owner filed an application for a beer permit and a compensated dance permit from the city beer board, and for a certificate of occupancy with the local construction code enforcement office. After protracted litigation, the nightclub owner obtained the necessary beer and compensated dance permits. Subsequently, the construction code office issued a certificate of occupancy to the nightclub owner, but later sought to restrict it to prohibit sexually-oriented entertainment. This was unsuccessful, so the construction code enforcement office revoked the certificate. The nightclub owner then filed the instant petition for a writ of mandamus against the county and the construction code enforcement office, asking the trial court to compel the construction code office to issue an unrestricted certificate of occupancy. The defendants argued, *inter alia*, that the plaintiff's intended use for adult entertainment was not "grandfathered" because the plaintiff had abandoned the nightclub while seeking the required permits. After a bench trial, the trial court held in favor of the nightclub owner and granted the writ of mandamus. The defendants now appeal. We affirm, finding that the trial court did not err in finding that the nightclub owner's business use was lawful, and that the nightclub owner did not abandon the property during the time it was involved in litigation over the beer permit.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P. J., W.S., and DAVID R. FARMER, J., joined.

Brian Kuhn, Shelby County Attorney, Robert B. Rolwing, Assistant County Attorney, and J. Carter S. Gray, Assistant County Attorney, for the appellant, Shelby County, Tennessee.

Elbert Jefferson, Jr., Memphis City Attorney, J. Michael Fletcher, Deputy City Attorney, and Roane Waring, Assistant Memphis City Attorney, for the appellant, City of Memphis.

J. Michael Murray, Cleveland, Tennessee, and Rex Brasher, Memphis Tennessee, for the appellee, Manhattan, Inc., d/b/a New York New York.

**OPINION**

The issue in this appeal is whether the plaintiff can operate an adult-oriented business in its current location. Plaintiff/Appellee Manhattan, Inc., d/b/a New York New York ("Manhattan"), is a corporation owned by Steve Cooper ("Cooper"). Cooper owns several topless clubs and other adult-entertainment businesses, including the topless club at issue in this case, called "New York New York," located at 2080 East Brooks Road in Memphis, Tennessee. New York New York is located directly across the street from property that was zoned as residential when it was originally developed. In approximately 1972, the Memphis International Airport ("the Airport") acquired the property across the street from New York New York, and continues to own it.

Sometime in 1992 or 1993, Cooper and a partner purchased the 2080 East Brooks Road property. At that time, the property housed a vacant nightclub named "Desperado." Cooper and his partner remodeled and reopened the business as a club and named it "Mirage." In April 1994, Cooper became the sole owner of the real property on which the club was situated. Mirage featured adult entertainment such as wet t-shirt contests, Chippendale-style male dance revues, and female amateur exotic dance contests.

When Mirage first began presenting adult entertainment, the constellation of laws regulating the zoning of adult-oriented businesses included Memphis City Ordinance No. 3647, commonly referred to as the "Johnican Ordinance." The Johnican Ordinance stated that sexually-oriented businesses were prohibited from operating within 1,000 feet of certain designated uses such as schools, churches, residential districts, and other adult businesses. In 1996, Memphis and Shelby County enacted a zoning ordinance that effectively increased that distance to 1,500 feet.[1] It is undisputed that there is an adult bookstore outside 1,000 feet but within 1,500 feet of the property on which the Mirage was located.[2] Thus, under the old Johnican Ordinance, the Mirage was not too close to the bookstore, but under the 1996 zoning ordinance, it was too close.

Sometime during 2002, Cooper sold his interest in the Mirage to his business partner; however, he retained ownership of the real property and charged rent to the Mirage. In December 2002, Cooper assumed 100% control over the Mirage, because his former partner did not timely make rental payments. At that time, Cooper began making plans to renovate the existing business

---

[1]The 1996 zoning ordinance provides that adult entertainment use "will not be located within 1,500 feet of any schools, churches, parks, residential use or residential zoning district as measured between property lines or applicable zoning district boundaries or within 1,500 feet of any other adult entertainment use."

[2]The adult bookstore is the Airport Bookmart at 2214 Brooks Road.

and obtain the necessary permits to open a new topless club, New York New York. To this end, Manhattan applied to the Memphis Alcohol Commission, also called the "Beer Board," for both a beer permit and a compensated dance permit for the new club. It also applied for a certificate of occupancy. In June 2003, Manhattan obtained the certificate of occupancy, but had not yet received either a beer permit or a compensated dance permit.

On September 17, 2003, the Beer Board conducted a hearing on Manhattan's application for a beer permit. At the hearing, the City opposed issuance of the permit because, among other things, Manhattan's property was within 1,500 feet of an adult bookstore in violation of the 1996 zoning ordinance. Manhattan acknowledged that it was 1,400 feet away from an adult bookstore, but asserted that it was in compliance with the Johnican Ordinance, i.e., it was not within 1,000 feet of a church, school, or residential area. Manhattan noted that the Johnican Ordinance was the law that was in existence when the property began being used to provide adult entertainment. Manhattan argued that, because the property began being used as an adult-entertainment business prior to the 1996 change in the law, it should be permitted to continue operating as a prior nonconforming use; in other words, it was "grandfathered" in and should be exempt from the 1,500-foot standard set forth in the 1996 zoning law. On this basis, Manhattan argued that it was entitled to a beer permit. At the conclusion of the hearing, the Beer Board denied Manhattan's application for a beer permit. The compensated dance permit was neither issued nor denied.

After the Beer Board denied its application, Manhattan filed a petition for a writ of certiorari in the trial court requesting that the trial court order the Beer Board to issue the beer permit. In this lawsuit, Manhattan named only the City of Memphis ("City") as a defendant, and Shelby County was not a party. In the petition, Manhattan noted that the Beer Board based its decision to deny the permit on the fact that New York New York would be within 1,500 feet of another adult business. Manhattan again argued that it should be grandfathered in and not required to comply with the 1,500-foot standard, because an adult business had been in operation in that location since prior to the effective date of the new zoning ordinance. In its answer, the Beer Board maintained that its denial of the permit was justified because Manhattan had not proven that its business was a valid prior nonconforming use.

The trial court held a hearing on Manhattan's petition. On May 23, 2005, after the hearing, the trial court entered an order granting summary judgment in favor of Manhattan and directing the Beer Board to issue a beer permit and compensated dance permit to Manhattan. It found that Manhattan and its predecessors had operated nightclubs that featured adult-oriented entertainment continuously since 1994. The court then noted that the new zoning ordinance changed the distance limit for nearby schools, churches, and residences from 1,000 feet under the Johnican Ordinance to 1,500 feet. It observed that an adult bookstore was within the 1,500-foot limit of 2080 East Brooks Road, but concluded that the location "is grand-fathered in for adult use by virtue of its prior use and by virtue of the fact that a beer permit and compensated dance permit had been applied for within six months of the closure of the business in December of 2002." On this basis, the trial court ordered the Beer Board to "immediately issue a beer permit and compensated dance permit" to Manhattan. This order was not appealed.

Subsequently, the Beer Board issued a beer permit and a compensated dance permit to Manhattan. On the face of the dance permit, however, the words "NO NUDITY" were prominently placed.

Following the issuance of the trial court's May 23, 2005 order, Cooper met with Allen Medlock, an administrator and building official at the Memphis and Shelby County Office of Construction Code Enforcement[3] with whom Cooper had been acquainted for over thirty years.[4] The Office of Construction Code Enforcement issues building permits, as well as certificates of occupancy to businesses, which allow the recipient to conduct business with the public. Cooper showed Medlock the May 2005 order and told Medlock that he was preparing to remodel Mirage and open it as an adult club featuring topless entertainment. Medlock did not indicate to Cooper at that time whether he would be issued the necessary permits to do so.

On June 9, 2005, Manhattan applied to the Office of Construction Code Enforcement for a building permit for a restaurant at the Mirage location. Manhattan did not at that time seek a building permit for a nightclub. The building permit was issued for a restaurant. Cooper then invested a substantial amount of money into remodeling the club. On February 20, 2006, Manhattan amended its building permit application, changing the anticipated use from restaurant to adult entertainment. Manhattan also applied for another certificate of occupancy for the premises.

On March 3, 2006, the Office of Construction Code Enforcement issued the requested certificate of occupancy to Manhattan for the operation of a nightclub. Later that same day, however, Medlock called Cooper on the telephone, asking him to return the certificate of occupancy issued hours earlier for "necessary clarification."[5] Medlock explained to Cooper that he wanted the certificate back so that he could include language indicating that adult entertainment could not be presented at that location. The basis for his request, Medlock said, was a moratorium on the issuance of permits for adult entertainment establishments that had been enacted by the Memphis City Council on December 20, 2005. The moratorium did not prevent the issuance of a certificate of occupancy to an adult entertainment business that was grandfathered as a prior nonconforming use, but Medlock maintained that Manhattan did not qualify for this exception. Cooper refused to return the certificate of occupancy. The Office of Construction Code Enforcement then revoked Manhattan's initial certificate of occupancy and issued a new certificate which specified that Manhattan could not present adult entertainment at that location.

---

[3]The Memphis and Shelby County Office of Construction Code Enforcement is a division of the Memphis and Shelby County Office of Planning and Development.

[4]City beer permits are governed by Tennessee Code Annotated §§ 57-5-101, *et seq.* and the City Code. Certificates of occupancy, however, are governed by the joint Memphis and Shelby County Zoning Code. The Memphis and Shelby County Office of Construction Code Enforcement enforces the joint city and county ordinances.

[5]Medlock later sent Cooper a letter with the same request.

Despite the controversy over the certificate of occupancy, the record indicates that Manhattan opened New York New York for business as a topless club at that time, presumably based on the new certificate of occupancy.

On March 15, 2006, Manhattan filed the instant petition for writ of mandamus against Defendants/Appellants Shelby County, the City, and the Office of Construction Code Enforcement (collectively, "Defendants"), seeking to compel the Defendants to reissue an unrestricted certificate of occupancy. In addition, Manhattan filed a motion for a temporary restraining order ("TRO") to allow it to continue to provide adult entertainment until a hearing on the merits of its petition. The motion for a TRO was denied. Consequently, Manhattan closed its nightclub pending resolution of its petition.

The trial court conducted a three-day trial in the matter beginning on May 8, 2006. Several witnesses testified about the course of events that led to Manhattan's petition. Substantial evidence was presented on the pivotal issue of whether Manhattan had conducted an adult-oriented business at the 2080 East Brooks Road address continuously from the time it was purchased until the time of the hearing. The primary evidence on this issue was adduced through the testimony of both Construction Code Enforcement official Alan Medlock and Manhattan owner Steve Cooper.

Medlock told the trial court that he had worked for the Office of Construction Code Enforcement for thirty-seven years. He testified in general about the applicable zoning ordinances and the procedures for obtaining certificates of occupancy. He described the incident on May 3, 2006, when he granted a certificate of occupancy to Manhattan and then sought return of the certificate in order to insert limiting language, characterizing the omission of the limitation as an oversight. After Cooper refused to return the certificate, Medlock said, he revoked it. Medlock admitted that, had the location been grandfathered in and in compliance with the Johnican Ordinance, Manhattan would have been entitled to the unrestricted certificate of occupancy, because the December 2005 moratorium would not have prevented its issuance.

Steve Cooper's testimony established the history of the property at 2080 East Brooks Road from the time he acquired an interest in it in the early 1990s through the May 3, 2006 incident in which the certificate of occupancy for New York New York was issued and then later revoked. Much evidence was submitted through Cooper to show that the adult-oriented business at the East Brooks Road location remained in operation continuously through December 2002. Cooper said that he did not reopen the business again until March 2006, because he did not have the necessary permits until after the beer permit litigation was concluded. The initial ruling in favor of Manhattan was issued in May 2005, and, pursuant to the trial court's order, the compensated dance permit and the beer permit were issued in July 2005 and December 2005, respectively.

Cooper also testified about his meeting with Medlock. He said that he showed Medlock the May 2005 order and told Medlock that he intended to open an adult-oriented business at the East Brooks Road location. Cooper testified that, after he obtained a building permit for New York New York, he spent about $500,000 to $700,000 on new furniture and other renovations. Cooper said

that, if he were not permitted to open New York New York, he would have to forfeit the money spent on the renovations.

After the conclusion of the testimony, on July 25, 2006, the trial court issued an oral ruling in favor of Manhattan. The trial court first determined that the initial permit issued for the property prior to 1996 was not invalid as a result of the Club's location across the street from "residential" property:

> All parties agree that because of state statutory designation as to the airport residential property and the restrictions thereon when taken 25 years ago that the residential restriction does not apply in this case. The zoning in this neighborhood is light industrial or industrial. There are no schools or recognized churches or other adult entertainment locations within 1,000 feet, and thus all parties acknowledge that if grandfathered in, most likely this establishment is subject to and operating under and in compliance with the Johnican zoning ordinance.

The trial court then found that the City was collaterally estopped from arguing that Manhattan was not grandfathered in, based on trial court's holding in the May 2005 order. It concluded, however, that the County was not collaterally estopped from making this argument, because it was not a party to the earlier lawsuit. In considering the County's argument, the trial court determined that the evidence preponderated in favor of finding that the business at 2080 East Brooks Road had operated continuously as an adult-oriented business since 1994 and, therefore, was grandfathered in under the Johnican Ordinance. The trial court explained:

> As to the City, the Court ruled herein that they are bound by that earlier [May 2005] ruling. . . . The City has made no motion for relief [from the May 2005 order], nor did the city appeal; thus, the order of the summary judgment is a final order . . . as to the City after 30 days expiring.
>
> As to the County, the Court found that the County was unrepresented at the first hearing, although proof has been adduced that an employee of the Memphis and Shelby [County] Code Enforcement was at the Alcohol Commission board hearing. In [an] abundance of caution, this Court allowed the County, with the City's participation, to present proof that in fact this was not a continuously operating adult-oriented business and therefore not grandfathered in.
>
> The Court finds the County's proof unpersuasive in light of the numerous city-issued permits, the confusion of utility bills, and the testimony of the Code employees that they were aware of this business, this owner, and saw the plans for renovation with the center stage and other accoutrements of an adult entertainment sexually-oriented business at 2080 Brooks Road.
>
> The Court was persuaded by the proof of the Petitioner that in fact there was, as early as 1994, an adult-oriented business at this location. The County's own employees, primarily Allen Medlock, persuaded this Court that other facilities ran adult-oriented businesses on permits labeled restaurant, nightclub, or assembly.

Mr. Medlock is the administrator and building official of the Construction Code Enforcement. The city zoning – as defined in the city zoning ordinances, the building official is the chief administrative head of the City or County, or in this case, the City and County building department. Mr. Medlock has been employed there for 37 years. He's known Mr. Cooper for 30 years and stated he thinks he is an honorable man.

Mr. Medlock remembers a discussion with Mr. Cooper in 2005 about this Court's ruling and the fact of grandfathering of the establishment for beer and compensated dance permits. Mr. Medlock remembers seeing the plans for the club, knowing that the center stage and surrounding rooms with couches were for adult-oriented entertainment.

Mr. Medlock admitted during the City's moratorium that the office issued at least two other adult entertainment certificates of occupancy. Mr. Medlock admitted that he has the authority to issue a certificate of occupancy if the establishment is in compliance with the zoning regulations. He admitted that many prior certificates of occupancy were issued designated as restaurant, nightclub, and assembly that – for locations that were being or were to be used as adult entertainment.

Mr. Medlock admitted that Phil Brewer, the individual who attended the city Beer Board hearing, is an employee of his Office of Code Enforcement. Mr. Medlock admitted that if Manhattan, Inc., doing business as New York, New York, is grandfathered in and thus subject to the Johnican zoning ordinance, that the club would be in compliance; that there is no such thing as an adult entertainment permit, and that no notation of adult entertainment has to be on the certificate of occupancy if the establishment is noted as a restaurant or nightclub and fits the zoning regulations.

The trial court concluded by finding that "Manhattan d/b/a New York, New York is merely a different name for the club that has operated at 2080 Brooks Road since at least 1994 offering adult sexually-oriented entertainment and that by virtue of that operation is grandfathered in under the zoning ordinance . . . ." Based on this conclusion, the trial court granted the writ of mandamus sought by Manhattan. On August 3, 2006, the trial court entered a written order incorporating by reference its oral ruling and requiring the Defendants "to issue forthwith whatever Certificates of Use and Occupancy as may be needed for the Petitioner to lawfully operate at 2080 Brooks Road, Memphis, Shelby County, Tennessee, as an adult-oriented business establishment."[6] From this order, the Defendants now appeal.

On appeal, the Defendants first argue that the trial court improperly shifted the burden of proof to them to show that Manhattan was not grandfathered in, rather than requiring Manhattan to prove that its business was a prior lawful nonconforming use. They assert that the provision of adult entertainment at the East Brooks Road location was unlawful at all pertinent times because the

---

[6] The appellate record was supplemented with a final order entered on March 8, 2007 *nunc pro tunc* to the date of the August 3, 2006 order, specifying that Manhattan's request for damages was denied and reserving the issue of attorney's fees.

business is located directly across the street from residentially-zoned property and, as a consequence, Manhattan cannot prove a lawful, prior nonconforming use. Additionally, the Defendants claim that Manhattan cannot show a prior nonconforming use because it abandoned the use of the property between December 2002 and August 2006. Therefore, the business cannot be grandfathered in and must comply with the 1,500-foot zoning restriction. It is undisputed that Manhattan cannot comply with the 1,500-foot zoning restriction based on the proximity of the adult bookstore; therefore, it is not entitled to a certificate of occupancy, and the mandamus order must be reversed.

Because the trial in this case was conducted by the trial court sitting without a jury, we review the trial court's findings of fact *de novo* on the record, presuming those findings of fact to be correct unless the evidence preponderates otherwise. *Dorning v. Bailey*, 223 S.W.3d 269, 272 (Tenn. Ct. App. 2007); Tenn. R. App. P. 13(d). This Court must give great weight to findings that were based on witness credibility, and such findings will not be reversed absent clear and convincing proof to the contrary. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). We review the trial court's conclusions of law *de novo*, affording no deference to the trial court's legal conclusions. *Dorning*, 223 S.W.3d at 272.

A writ of mandamus is an extraordinary remedy that may be issued where a plaintiff's right to the relief sought has been clearly established, the defendant has a clear duty to perform the act the plaintiff seeks to compel, and "there is no other plain, adequate, and complete method of obtaining the relief to which one is entitled." *Cherokee Country Club, Inc. v. City of Knoxville*, 152 S.W.3d 466, 479 (Tenn. 2004) (quoting *Meighan v. U.S. Sprint Comm'ns Co.*, 942 S.W.2d 476, 479 (Tenn. 1997)). Manhattan, the party seeking the writ, has the burden of establishing that it is entitled to the writ. *See Lamar Tenn., LLC v. City of Hendersonville*, 171 S.W.3d 831, 836 (Tenn. Ct. App. 2005).

The lawful use of property existing before the enactment of a zoning ordinance is commonly referred to as a "nonconforming use." *Lafferty v. City of Winchester*, 46 S.W.3d 752, 754 n.1 (Tenn. Ct. App. 2000) (citing 1 Kenneth H. Young, *Anderson's American Law of Zoning* § 6.01 (4th ed. 1995)). "A nonconforming use is considered 'grandfathered' when the use is specifically exempted from the ordinance's application on grounds that the property was being used that way when the ordinance took effect."[7] *Id.* The Memphis-Shelby County zoning ordinances specifically permit a lawful use in existence at the time of any zoning change to continue after the change, i.e., "grandfathered" nonconforming use, with certain restrictions:

> *B. Nonconforming uses of land and structures.*
> 1. *Authority to continue.* Any lawfully existing nonconforming use of part or all of
> a structure, or any lawfully existing nonconforming use of land not involving a

---

[7] A "grandfather clause" is defined as "an exception to a restriction that allows all those already doing something to continue doing it, even if they would be stopped by the new restriction." BLACK'S LAW DICTIONARY 629 (5th ed.1979), *quoted in Coe v. City of Sevierville*, 21 S.W.3d 237, 243 (Tenn. Ct. App. 2000) (citation omitted).

structure or involving a structure which is accessory to such use of land, may be continued, so long as it remains otherwise lawful . . . .

Memphis-Shelby County Zoning Code § 30(B)(1) (2006); *see also* T.C.A. §13-7-208, 210 (Supp. 2007). The ordinances also provide, however, that when the nonconforming use is discontinued or abandoned for a period of 365 days, it will no longer be "grandfathered" or permitted:

6. *Abandonment or discontinuance.* When a nonconforming use of land or a nonconforming use of part or all of a structure is discontinued or abandoned for a period of 365 consecutive days (regardless of any reservation of an intent not to abandon and to resume such use), such use shall not thereafter be reestablished or resumed. Any subsequent use or occupancy of such land or structure shall comply with the regulations of the zoning district in which such land or structure is located.

Memphis-Shelby County Zoning Code § 30(B)(6).

In this case, Manhattan asserts that its prior nonconforming use was lawful and that, therefore, it should not have been denied a certificate of occupancy based on the 1,500-foot restriction in the 1996 zoning ordinance. Therefore, to establish its entitlement to the writ, Manhattan bears the burden of proving the existence of a lawful, prior nonconforming use, that the Defendants had the duty to issue the certificate of occupancy, and that there is "no other plain, adequate, and complete method" of obtaining the relief sought. *See Cherokee Country Club*, 152 S.W.3d at 479.

On appeal, the Defendants first argue that, rather than placing the burden on Manhattan to prove a prior nonconforming use, the trial court improperly shifted the burden of proof to the County to prove the absence of a prior nonconforming use. To support this assertion, the Defendants point to the trial court's oral ruling, quoted above, in which the trial court stated that it "allowed the County . . . to present proof that in fact this was not a continuously operating adult-oriented business," and that "the County's proof [was] unpersuasive" on this issue. Thus, the Defendants contend, because the language in the trial court's oral ruling indicates that it placed the burden of proof on the County, its decision must be reversed.

From a careful review of the entire record in this cause, we find that the trial court did not improperly place the burden of proof on the Defendants. The trial court's statement that it "allowed the County . . . to present proof," was made in the context of its finding that, while the City was estopped from disputing Manhattan's prior nonconforming use, the County was not estopped, and therefore would be permitted to dispute Manhattan's claim that the business at 2080 East Brooks Road was a continuously operating adult-oriented business. The trial court's statement that "the County's proof was unpersuasive" likewise did not reflect an allocation of the burden of proof, but simply its conclusion that Manhattan's proof was persuasive on this issue, while the County's was not. When the trial court's ruling is read in total, it becomes clear that the trial court carefully considered the proof submitted by both parties, weighed the credibility of the witnesses, and identified the specific evidence supporting its holding that Manhattan was entitled to the certificate

of occupancy. Indeed, the trial court ultimately stated that it was "persuaded by the proof of Petitioner that in fact there was, as early as 1994, an adult-oriented business at this location." Therefore, the Defendants' assertion that the trial court misallocated the burden of proof is not supported by the record.

The Defendants next argue that the trial court erred in finding that the Airport property across the street from the nightclub is not a "residential district"[8] within the meaning of the Johnican Ordinance, and therefore that the prior nonconforming use by Manhattan and its predecessors was lawful.[9] The Defendants argue that the Airport property across the street from Manhattan's nightclub must still be considered within a "residential district," as the term is used in the Johnican Ordinance, and that, consequently, Manhattan's adult-oriented use of the East Brooks Road property has at all times been unlawful because it is within 1,000 feet of the residentially-zoned property across the street. The Defendants acknowledge the state statutes to which the trial court referred, statutes on which Manhattan relies in claiming that the Airport's ownership of the property nullifies the zoning designation. They contend, however, that these state statutes are irrelevant, and assert that the Airport's ownership of the residential property does not affect its local zoning designation as "residential." Thus, because Manhattan's business is within 1,000 feet of residential property, in violation of the Johnican Ordinance, its use was at all times unlawful and cannot be grandfathered in as a prior nonconforming use."

In response, Manhattan asserts that, under the applicable Tennessee statutes, once land is acquired for airport purposes, it is deemed land to be used for " public and governmental purpose." As such, the local governments no longer have the authority to enforce a residential zoning designation; they retain only the authority to regulate airport hazards. In support of this argument, Manhattan first cites Tennessee Code Annotated § 42-3-115, which provides that any land acquired by the Airport Authority is "declared to be acquired and used for public and governmental purposes":

> The acquisition of any land, or interest in land, pursuant to this chapter, the planning, acquisition, establishment, development, construction, improvement, maintenance, equipment, operation, regulation and protection of airports, air navigation facilities and avigation easements, including the acquisition or elimination of airport hazards and the exercise of any other powers granted in this chapter to authorities and other public agencies, to be severally or jointly exercised, are declared to be public and governmental functions, exercised for a public purpose, and matters of public necessity. ***All land and other property and privileges acquired and used by or on***

---

[8]The Johnican Ordinance states that a sexually-oriented business cannot be within 1,000 feet of a "residential district as defined by the Memphis City Code." The Memphis City Code provides that a "residential district" means "any district whose designation begins with the letter 'R' or 'AG.' " Memphis City Code § 16-8-2. It is undisputed that, under this definition, the zoning designation of the property involved in this case is residential.

[9]The Defendants challenge the trial court's finding that the parties had agreed on this point. As evidence that this issue was contested, the Defendants cite their trial memorandum and arguments to the court at trial in which they maintained that the adult-oriented use of the property was unlawful based on its proximity to the residential property. For purposes of this appeal, we assume that the Defendants did not agree on this issue.

-10-

***behalf of any authority or other public agency in the manner and for the purposes enumerated in this chapter shall and are declared to be acquired and used for public and governmental purposes and as a matter of public necessity.***

T.C.A. § 42-3-115 (2007). A subsequent statutory provision clarifies that "[n]othing contained in this chapter shall be construed to limit any right, power or authority of a municipality to regulate airport hazards by zoning." T.C.A. § 42-3-119 (2007). Manhattan argues that these statutes make it clear that, once land is acquired by the Airport authority, the only authority retained by the municipality is the authority to regulate airport hazards by zoning; it is not otherwise authorized to impose zoning restrictions on Airport property. Otherwise, Manhattan argues, "the airport would have to close because airports are not permitted uses in residential zones." Because the Defendants cannot enforce the residential zoning designation, Manhattan contends, the fact that the property was once zoned residential does not mean that it is considered a "residential district" within the meaning of the Johnican Ordinance.

Whether the residentially-zoned Airport property across the street from Manhattan is considered within a "residential district" under the Johnican Ordinance is a question of law. It is also an issue of first impression. We recap the relevant facts which are essentially undisputed. The property across the street from Manhattan's East Brooks Road nightclub was originally zoned as residential property by the local authorities. In approximately 1972, the Memphis International Airport acquired the property, and it is completely within the Airport Approach Zone. For over twenty-six years, there have been no residences located on the Airport property. The area is bound by chain-link and barbed wire fencing.

The power of local governments to control the use of private property within their boundaries is derived from the State:

> Local governments lack inherent power to control the use of private property within their boundaries. Their power derives from the State through specific delegation by the General Assembly. While local governments have considerable discretion to act within the scope of their delegated power, they cannot effectively nullify state law on the same subject by enacting ordinances that ignore applicable state laws, that grant rights that state law denies, or that deny rights that state law grants. Thus, local governments must exercise their delegated power consistently with the delegation statutes from which they derive their power.

***421 Corp. v. Metro. Gov't of Nashville & Davidson County***, 36 S.W.3d 469, 475 (Tenn. Ct. App. 2000) (citations omitted). While local governments enjoy broad discretion in enacting regulations within the boundaries of their authority, they "cannot wield their land use control power in conflict with state law." ***Id.*** at 476.

General rules of statutory construction apply to local ordinances. Thus, when the language of an ordinance is clear, the ordinance will generally be enforced as written. ***Id.*** at 475. Even clear ordinances, however, must be construed *in pari materia* with other ordinances and "in light of the

state statutes empowering local governments to enact them in order to avoid conflict and to enable related statutes and ordinances to operate concurrently." *Id.* at 475-76. If an ordinance conflicts with a state statute, without question, "the ordinance must give way to the imperatives of the statute." *B.F. Nashville, Inc. v. City of Franklin*, No. M2003-00180-COA-R3-CV, 2005 WL 127082, at *15 (Tenn. Ct. App. Jan. 21, 2005) (citing *Manning v. City of Lebanon*, 124 S.W.3d 562, 565 (Tenn. Ct. App. 2003)).

In this case, to determine whether residentially-zoned property which is subsequently acquired by the Airport constitutes a "residential district" within the meaning of the Johnican Ordinance, we must examine the language of the Ordinance in light of Tennessee's Airport Authorities Act ("the Act"), Tennessee Code Annotated § 42-3-101, *et seq*. The original residential designation of the Airport property has never been changed by the local authorities. However, once this property was acquired by the Airport, under the Tennessee statute it is deemed to be "acquired and used for public and governmental purposes." T.C.A. § 42-3-115. A municipality or county may "regulate airport hazards by zoning," and indeed, as to airport hazard areas within its territorial limits, is required to "adopt, administer and enforce . . . airport zoning regulations for such airport hazard area, . . . provided, that these regulations are solely for the purposes of preventing airport hazards." T.C.A. §§ 42-3-119 and 42-6-103(a). An "airport hazard" is defined as "any structure or tree or use of land that obstructs the airspace required for the flight of aircraft in landing or taking off of aircraft." T.C.A. § 42-6-101(2). "Airport hazard area" is defined as "any area of land or water upon which an airport hazard might be established if not prevented as provided in this chapter." T.C.A. § 42-6-101(3).

As noted above, when an ordinance conflicts with a statute, "the ordinance must give way to the imperatives of the statute." *B.F. Nashville*, 2005 WL 127082, at *15. Reading the above-cited statutes together, it appears that, once property is acquired by an airport authority, it is declared by the State to be used for public and governmental purposes, and the county or municipality in which the property is located no longer has the authority to "adopt, administer and enforce" any regulations relating to that property except insofar as the regulation is intended "solely for the purposes of preventing airport hazards." T.C.A. § 42-6-103(a). Because no regulations other than those for hazard prevention can be enforced, and the residential zoning designation does not relate to hazard prevention, then the residential zoning designation previously assigned to the property is unenforceable. Thus, because the residential designation is not enforceable, we do not consider the Airport property to be in a "residential district" as the term is used in the Johnican Ordinance. Therefore, the business operating at 2080 East Brooks Road is not in violation of the Johnican Ordinance by virtue of its proximity to the Airport property.

Finally, the Defendants argue that Manhattan's adult-oriented club cannot be grandfathered in as a nonconforming use because Manhattan abandoned the nonconforming use of the property for the approximately three-year period between December 2002 when Cooper took over the business, until March 2006, when he reopened the business, despite the fact that his unrestricted certificate of occupancy had been revoked. It is undisputed that no business was conducted on the property during this time.

Under the applicable zoning ordinance, set forth above, a use is deemed to be discontinued or abandoned after 365 consecutive days of nonuse, "regardless of any reservation of an intent not to abandon and to resume such use." Memphis-Shelby County Zoning Code § 30(B)(6). Once abandoned, the use cannot be considered to be a prior nonconforming use for purposes of being grandfathered under prior laws; rather, it must conform to the laws as they exist when use of the property is resumed. *Id.*

The facts related to the alleged period of abandonment are essentially undisputed. We review them briefly. Once the Mirage Club was turned over to Cooper in December 2002, he did not immediately reopen it. Rather, after a few months, Cooper applied for a beer permit and a compensated dance permit to enable him to reopen the establishment as a topless club named New York New York. The application was denied by the City in September 2003. Almost immediately, Manhattan filed a petition in the trial court for a writ of certiorari to obtain the permits. This litigation remained pending for almost two years. On May 23, 2005, Manhattan obtained a writ of mandamus requiring the City to issue the permits. Pursuant to this order, the compensated dance permit was issued in July 2005, and the beer permit was issued in December 2005. Meanwhile, in June 2005, Cooper applied for a building permit and a certificate of use and occupancy with the Defendants. On June 18, 2005, Manhattan filed architect's plans for the adult entertainment establishment. In March 2006, New York New York was opened for business, despite the Office of Code Enforcement's revocation of the original unrestricted certificate of use and occupancy. Therefore, it is clear that during most of the time from December 2002 to March 2006, the litigation over the beer and compensated dance permits prevented Manhattan from using the property for an adult-oriented business.

The Defendants argue that, because Manhattan's business was closed for three consecutive years, regardless of the reason, the adult-oriented business use was abandoned, and any business reestablished in that location must comply with the laws in existence when they sought to reestablish, specifically, the 1,500-foot zoning regulation. The Defendants emphasize that the zoning code expressly ignores the owner's intent to resume the business and contend that, therefore, the beer-permit litigation is of no consequence. *See Toles v. City of Dyersburg*, 39 S.W.3d 138, 141 (Tenn. Ct. App. 2000) (holding that intent is irrelevant where the failure to resume business was due to factors within the control of the landowner, such as making repairs). They note that Manhattan did not reopen as an adult-oriented business in December 2002 because Cooper decided to make extensive repairs and renovations. These actions are considered as preparation for use, which does not constitute a pre-existing non-conforming use. *See Custom Land Dev't, Inc. v. Town of Coopertown*, 168 S.W.3d 764, 775 (Tenn. Ct. App. 2004). Therefore, the Defendants claim, Manhattan's three-year discontinuation of use at the subject property constituted abandonment of the adult business use.

Two cases cited by the parties are instructive on this issue. The first is *Boles v. City of Chattanooga*, 892 S.W.2d 416 (Tenn. Ct. App. 1994). In *Boles*, the plaintiff sought to operate an adult-entertainment establishment. The plaintiff had operated an adult bookstore at the location since the early 1970's. In 1977, the City of Chattanooga amended its zoning regulations regarding adult establishments. After the amendments, the plaintiff's property was no longer zoned for adult

businesses, but the plaintiff was permitted to continue to operate the bookstore as a "grandfathered" pre-existing, nonconforming use. In November 1987, the local district attorney general obtained a temporary injunction against the plaintiff's business as a public nuisance, and the plaintiff was enjoined for operating the bookstore. Ultimately, the plaintiff was permanently enjoined from maintaining a nuisance, and in October 1989, the plaintiff leased the premises to a third party for the operation of an adult-oriented establishment. Local authorities, however, prevented this use, asserting that the business was not "grandfathered" because the nonconforming use had been discontinued for more than 100 days.[10] The plaintiff filed a declaratory judgment action, and the trial court found that the failure to operate the adult establishment was not a "discontinuance" because it was involuntary. *Id.* at 412. The defendant city appealed. The appellate court held that "the term 'discontinued' or words of similar import, as utilized in zoning ordinances with specific time limitations, should be construed to include an element of intent, combined with some act – or failure to act – indicative of abandonment." *Id.* at 422. Because the plaintiff's failure to operate its adult establishment was compelled by an injunction, the appellate court held that the use was not "discontinued" under the zoning ordinance. *Id.* at 422-23; *see also Chadwell v. Knox County*, 980 S.W.2d 378, 381 (Tenn. Ct. App. 1998) (holding that the involuntary discontinuance of business due to a cease and desist order cannot be deemed to be abandonment under the zoning ordinance).

Along with *Boles*, we must construe *Toles v. City of Dyersburg*, 39 S.W.3d 138 (Tenn. Ct. App. 2000). In *Toles*, the plaintiff Toles owned property on which there had been a nightclub for many years. *Id.* at 139. The previous owner let the business license expire on March 31, 1998, and surrendered the beer license on July 1, 1998. In approximately April 1998, the plaintiff began making repairs and improvements to the club building. In July 1998, the person who planned to manage and operate the club applied for a beer license and was told that, in light of the building's structural deficiencies, further repairs were required before her application for a beer permit could be processed. Three re-inspections were conducted, and on October 1, 1998, the club premises was finally found to be in compliance with the local building codes. *Id.* at 140.

In the meantime, local authorities had re-zoned the area as residential. On October 19, 1998, after the re-zoning, the plaintiff's application for a beer permit was denied. The basis for the denial was that there was no operating business on the property at the time of the re-zoning, so the property's use as a club could not be "grandfathered" into the now-residential area. The property owner filed a writ of certiorari, and the trial court affirmed the city's denial of a beer permit. The property owner appealed. The appellate court noted that the delay in re-opening the club occurred because (1) it took some time for the property owner to find someone to operate the club, and (2) structural deficiencies in the building stalled approval of the beer permit. The *Toles* court interpreted *Boles* as finding that "intent" was "only important where some force outside the control of the property owner prevents the continued use of the land in a particular manner." *Id.* at 141. The *Toles* court found that the plaintiff's failure to continue using the premises for a club was not prevented by such an outside force, and so "their intent [to continue operating the club] is not important . . . ."

---

[10]A Chattanooga ordinance stated that if the pre-existing nonconforming use was discontinued for 100 consecutive days, "then future use would have to conform to current ordinances." *Boles*, 892 S.W.2d at 417 n.1.

-14-

*Id.* The appellate court affirmed the trial court, finding that the city was within its rights to deny the plaintiff's beer permit.

In the case at bar, the zoning regulation differs from the zoning regulation at issue in ***Boles***. As in ***Boles***, the Memphis-Shelby County ordinance refers to a prior nonconforming use being "discontinued or abandoned" for 365 days. Unlike the ordinance in ***Boles***, however, the Memphis-Shelby County ordinance states that abandonment is determined "regardless of any reservation of an intent not to abandon and to resume such use. . . ." Ordinance § 30(B)(6). The ordinance in ***Boles*** did not include this proviso.

As in ***Toles***, Manhattan's club underwent repairs and renovations for some time. However, the fact that the business was undergoing repairs was not the reason for its failure to reopen within 365 days. Rather, Manhattan's club was closed for over two years because local authorities refused to grant the required permits, and their refusal stemmed from the adult-oriented use of the premises. This is analogous to ***Boles***, in which the adult business could not operate because of legal action against it by governmental authorities, a reason that was "purely involuntary in nature." ***Boles***, 892 S.W.2d at 422.

The facts in this case present a close question. We must respect the legislative intent behind the abandonment ordinance, which prescribes the consequences of a discontinuance or abandonment for 365 days, regardless of the property owner's intent not to abandon the nonconforming use.[11] Here, however, Manhattan was prevented from using the nightclub as an adult establishment by local authorities precisely *because* of the nonconforming use. If this were deemed a discontinuance or an abandonment, this would in fact undermine the ordinances allowing prior nonconforming uses under certain circumstances, because local authorities could force an abandonment by denying required permits or instituting legal action, even for spurious reasons. We believe that this would frustrate the legislative intent behind the ordinances, rather than serve it. Therefore, we hold that Manhattan did not voluntarily "discontinue" or "abandon" the nonconforming use of the property for a period of 365 consecutive days, and should therefore be permitted to continue its prior nonconforming use so long as it remains in compliance with the Johnican Ordinance and the other zoning ordinances in effect prior to the 1996 change in the law.

In sum, the trial court did not erroneously place the burden of proof on the Defendants, did not err in concluding that the Airport property located across from Manhattan's business was not a "residential district" under the Johnican Ordinance, and did not err in concluding that Manhattan did not abandon its property under the applicable zoning ordinance between December 2002 and March 2006. Consequently, the trial court properly granted the relief sought by Manhattan in its petition for writ of mandamus. All other issues raised herein are pretermitted.

---

[11]We note the ***Boles*** court's statement that, "[t]o hold that a non-conforming use can be cut off automatically by time limits on discontinuance, regardless of the reason for that discontinuance, strikes us as intrinsically unfair." ***Boles***, 892 S.W.2d at 422.

The decision of the trial court is affirmed. Costs on appeal are to be taxed against Appellants Shelby County, Tennessee, and the City of Memphis, Tennessee, and their sureties, for which execution may issue, if necessary.

 

 

 

 

_____
HOLLY M. KIRBY, JUDGE